IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAULINE YOUNG                          *

V.                                     *   CIVIL NO. SKG-07-875

UNITED STATES OF AMERICA               *


<u>MEMORANDUM OPINION</u>

Following administrative denial,[1] plaintiff filed this action

for personal injury against the United States of America in the

District Court under the Federal Tort Claims Act, 28 U.S.C. §§

1346(b), 2671-80, as amended ("FTCA").  Plaintiff alleges that an

employee of the United States Postal Service ("USPS"), while acting

within the scope of his employment, negligently caused her injury.

(Paper No. 1).  Specifically, this suit arises out of an automobile

accident in which a USPS truck collided with plaintiff's car while

the latter was parked in a parking lot.  (Paper No. 1 at 2).

Plaintiff claims that the impact injured her right hand and wrist.

(<u>Id.</u>).  The District Court has jurisdiction over this action under

28 U.S.C. § 1346(b)(1) and 39 U.S.C. § 409(a).

Currently pending before the Court is defendant's motion for

summary judgment.  (Paper No. 40).  Defendant raises two related

arguments in its motion: (1) that plaintiff cannot show that

---

[1] Plaintiff presented her claim to the USPS on June 26, 2006, in accordance with
28 U.S.C. §§ 2401, 2675, alleging $250,000 in damages.  (Paper No. 1 at 2).  The
USPS denied her claim on November 22, 2006.  (<u>Id.</u> at 3).  Plaintiff then filed
this suit in the District Court on April 5, 2007, pursuant to § 2675 and in accordance
with § 2401, alleging $13,112 in medical costs plus pain and suffering damages to
be computed by the trier of fact.  (Paper No. 1; Paper No. 2 at 13).

1

defendant's negligence proximately caused plaintiff's specific injuries and (2) that, to the extent plaintiff's unsuccessful reconstructive surgery (and subsequent, related operations) caused her harm, defendant is not liable, as the unnecessary, unsuccessful reconstuctive surgery is a superceding cause.  For the reasons below, the Court DENIES defendant's motion for summary judgment. Because resolution of the motion involves somewhat complicated issues of medical care and treatment, the Court sets out the facts and opinions in some detail.[2]

I.  Factual Background

     Plaintiff Pauline Young is a retired insurance claims handler. (Ex. 1 at 9, 13).  Plaintiff spent much time typing throughout her career.  (Id. at 29, 101).  On the date of the accident, September 10, 2004, she was 61 years old.  (Id. at 2).

     Plaintiff's Right Hand and Wrist Problems Prior to the September 10, 2004 Automobile Accident

     In 1990, plaintiff injured her right hand in an automobile accident, "from grabbing the steering wheel and holding it so hard." (Ex. 2 at 9-10; Ex. 1 at 24-27).  She experienced numbness in her right hand after the accident and underwent right carpal tunnel release surgery, performed by Dr. Thomas Dennis of the Orthopaedic and Sports Medicine Center, to address the injury.  (Id. at 25-26,

---

[2] When faced with a motion for summary judgment, a court must view the evidence and inferences to be drawn therefrom "in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The Court has done so.

32).  Her symptoms did not fully resolve after the procedure, and plaintiff had a re-release surgery on the same hand in 1994.  (Id. at 33).

Nine years later, plaintiff returned to Dr. Dennis, complaining of "significant [right] wrist pain" and "numbness from time to time." (Ex. 3 at 4).  Dr. Dennis recognized that "[s]he does a lot of typing and this certainly impacts on it," and ordered radiographs that showed "significant arthritis."  (Id.).  Dr. Dennis' impression was that "she is definitely having some recurrence of her carpal tunnel syndrome in the RIGHT and it is probably caused by the start of pantrapezial arthritis."  (Id.).

Plaintiff continued to see Dr. Dennis in connection with her arthritis and carpal tunnel symptoms throughout the winter and spring of 2004.  (Id. at 5-11).  On April 14, 2004, Dr. Dennis commented that "most of her persistent pain in the RIGHT hand is more related to the osteoarthritis than anything else." (Id. at 7).  On June 22, 2004, about two and a half months before the accident, plaintiff had a third right carpal tunnel release surgery to address the carpal tunnel syndrome in her right wrist.  (Id. at 10).

September 10, 2004 Automobile Accident

On September 10, 2004, plaintiff stood beside her parked car in a parking lot adjacent to a Wendy's restaurant.  (Ex. 2 at 7).  She was photographing the scene of an earlier accident in connection with her job duties.  (Id.).  Meanwhile, a USPS vehicle driven by Mr.

Thomas Rey passed through the same lot at about five miles per hour, headed into the Wendy's lot to make a delivery.  (Ex. 1 at 46; Ex. 4 at 42-47).  Mr. Rey did not see plaintiff's car as he turned, and the side of his truck bumped into the car's left rear bumper.  (Ex. 4 at 42-44).  Plaintiff testified that she heard the truck coming and then saw it out of the corner of her eye immediately before impact. (Ex. 1 at 46).  She placed her right hand on top of her car to brace herself and avoid falling.  (Ex. 2 at 7).  Plaintiff testified that Rey's truck "went up under the car." (Ex. 1 at 40).  Although plaintiff did not fall as a result of the impact, (Ex. 1 at 54), she reported suffering trauma to her right wrist, (Ex. 2 at 7).

A police officer arrived at the scene and completed an incident report.  (Ex. 6 at 5-7).  Plaintiff did not report any injuries and told the police officer that she did not wish to go to the hospital. (Ex. 1 at 69).  Plaintiff returned to her office for 10 or 15 minutes, and then went home.  (Id. at 74).

Plaintiff's Treatment after the Automobile Accident

Before chronicling plaintiff's treatment and diagnoses following the subject accident, it is helpful to provide background information on injuries to the hand and wrist area.  The scaphoid and lunate are two adjacent bones in the wrist.  (Ex. 11 at 9-10). The scapholunate ligament connects these two bones, and the area between them is the scapholunate interval.  (Id. at 10; Ex. 8 at 9).

Disruption occurs when the ligament completely detaches from one bone. (Id.).

Plaintiff received treatment for three separate injuries: a right wrist sprain, a right thumb ulnar collateral ligament sprain, and a tear of the right scapholunate ligament. (Ex. 7 at 1; Ex. 8 at 1).

### Plaintiff's Visit to Nighttime Pediatrics and Adult Care Center on the Night of the Accident

On the night of the accident, plaintiff went to Nighttime Pediatrics and Adult Care Center in Annapolis, Maryland. (Ex. 7 at 1). Plaintiff's arm was X-rayed and she was diagnosed with a right wrist sprain. (Id.). She was released with instructions to ice her wrist, take Aleve, and consult with an orthopedist. (Id.). Plaintiff returned to work the following day. (Ex. 1 at 74-75).

### Plaintiff's Visits to Chesapeake Orthopaedic & Sports Medicine Center during Fall 2004

Plaintiff visited Chesapeake Orthopaedic & Sports Medicine Center ("COSMC") in Glen Burnie, Maryland, on September 15, October 6, and December 15, 2004. (Ex. 8 at 1-7).

Plaintiff first visited COSMC on September 15, 2004, five days after the accident. (Id. at 1). Plaintiff was examined by a nurse practitioner, Karen Pipkin, and complained of pain in her right wrist. (Ex. 8 at 1; Ex. 11 at 43-45). X-rays revealed some scapholunate widening, but no acute findings, and showed mild degenerative changes. (Ex. 8 at 1). Nurse Practitioner Pipkin

observed "a mild amount of edema . . . along the volar aspect of her RIGHT wrist,"[3] with a full range of motion and no other tenderness, and concluded that plaintiff had suffered a right wrist sprain. (Id.).   The nurse instructed plaintiff to wear her splint, take pain medicine, return to work the next day, and come back for a follow-up. (Id.).   She further instructed plaintiff to begin hand therapy if she experienced no improvement in two weeks.   (Id.).

Plaintiff returned to COSMC on October 6, 2004, (Ex. 8 at 3), where she was again examined by Nurse Practitioner Pipkin.   (Ex. 11 at 61).   Plaintiff reported that she was still experiencing discomfort in her right wrist as well as some weakness.[4]   (Ex. 8 at 3).   Nurse Practitioner Pipkin observed "tender[ness] primarily along the first dorsal compartment of the RIGHT wrist. . . . [and] some burning along the volar aspect of the wrist extending into the thenar area. . . . She is able to gently flex and extend the wrist and digits."   (Id.).   Because plaintiff's pain had "not improved at all" and the x-ray showed "some mild scapholunate widening," an MRI was ordered to rule out a ligament tear.   (Id.).

Plaintiff had an MRI on October 11, 2004, which showed:

1.   Scapholunate separation with a possible scapholunate ligament tear.

2.   Somewhat poor definition of the ulnar collateral ligament of the thumb, a finding which may be seen with

---

[3] Defendant's expert, Dr. Thomas Graham, opined that this soreness, which was in the same area on which plaintiff had surgery three months prior, was not surprising. (Ex. 14 at 25).
[4] Plaintiff had not commenced hand therapy at this time.   (Id.).

sprain, related to a gamekeeper's type injury.  Clinical
correlation is recommended.

3.  Scarring surrounding the median nerve compatible with
postoperative change of prior carpal tunnel release.  The
nerve itself is mildly edematous.

(Ex. 8 at 5-6).

On December 15, 2004, plaintiff again visited COSMC, where she

reported continuing discomfort in her right wrist and weakness in

her right hand.  (Ex. 8 at 7).  For the first time, examination of

plaintiff showed tenderness in the scapholunate area, although her

overall swelling had significantly decreased.  (Id.).  Dr. O'Donovan

reviewed plaintiff's MRI and diagnosed her with (1) a right wrist

sprain with scapholunate tear, and (2) a right thumb ulnar collateral

ligament sprain/gamekeeper's thumb.  (Id.).  Plaintiff elected to

undergo right wrist scapholunate reconstructive surgery.  (Id.).

> Right Wrist Scapholunate Ligament Repair Surgery and BLATT
> Reconstruction Procedure

On January 20, 2005, Plaintiff underwent right wrist

scapholunate ligament repair surgery, as well as a BLATT

reconstruction procedure.[5]  (Ex. 8 at 9).  Dr. O'Donovan, who

performed both procedures, testified that the former is a major

procedure because it is a "real reconstruction of the wrist."  (Ex.

11 at 88-89).  It requires the surgeon to cut into bone, place anchors

inside the groove with thread attached, and sew the ligament to the

---

[5] Dr. Graham opined that "[t]he relatively long interval that existed between the
alleged onset of injury and the time of surgery is inconsistent with treating an
acute SL injury."  (Ex. 10 at ¶ 23).

bone.  (Id. at 84-88).  Dr. O'Donovan also performed a BLATT reconstruction, a similar procedure which increases the stability of the repair.  (Id. at 18-21, 86-87).

Upon entering plaintiff's wrist, Dr. O'Donovan noted disruption of the scapholunate ligament -- that is, the ligament was still attached to the lunate, but it was completely detached from the scaphoid.  (Id.).  However, Dr. O'Donovan noted that the ligament was of "stout" structure -- it was thick, sturdy, and could "hold a stitch without ripping."[6]  (Ex. 8 at 9; Ex. 11 at 32-33, 85-88).  Plaintiff experienced no complications, tolerated the procedure well, and entered recovery in good condition.  (Ex. 8 at 9).

On February 18, 2005, Dr. O'Donovan removed the deep, painful implants from plaintiff's right wrist.  (Ex. 8 at 10-11).  In the years following her surgery, plaintiff continued to experience pain and discomfort in her right hand and wrist.  (Ex. 8 at 12-16).

### January 26, 2006 Independent Medical Evaluation

On January 26, 2006, about one year after her reconstructive surgery, plaintiff underwent an Independent Medical Evaluation ("IME") in connection with her Workers' Compensation claim.  (Ex. 15 at 1-3).  Dr. Paul M. Apostolo, an orthopedist, conducted the IME. (Id. at 1).  Dr. Apostolo reviewed plaintiff's medical history and medical records following the accident.  (Id. at 1-2).  He noted

---

[6] Dr. Graham observed that the stoutness of the ligament was inconsistent with a four-month old injury and, rather, was characteristic of a recent injury.  (Ex. 13 at ¶ 16).  Dr. O'Donovan was also surprised by this finding.  (Ex. 11 at 88.).

that she felt "essentially unchanged and unimproved" since the surgery.  (Id. at 2).

Dr. Apostolo concluded that plaintiff suffered from right wrist pantrapezial osteoarthritis which was "aggravated by described injury" of September 10, 2004.  (Id. at 3).  He also observed that plaintiff had "chronic asymptomatic scapholunate ligament widening," which remained unchanged after her surgery, and commented that her case "highlight[ed] the pitfalls associated with operations performed on the limited basis of radiographs and MRI findings." (Id.).  According to Dr. Apostolo,

> Ms. Young has a 22% permanent and partial impairment of the right hand and wrist including her thumb following the described trauma of September 10, 2004.  Permanent and partial impairment is properly attributable 90% secondary to the injury (including iatrogenic features) and 10% secondary to preexisting factors.  Permanent partial impairment of the hand, wrist, and thumb attributable to this accident of September 10, 2004, is therefore 20%. All of the above opinions are stated to within a reasonable degree of medical certainty.

(Id. at 3-4).

### November 27, 2007 Proximal Row Carpectomy Procedure

On October 1, 2007, X-rays revealed signs of early "SLAC wrist," a clinical osteoarthritic condition that results from untreated scapholunate dissociation or chronic scaphoid non-union.  (Ex. 17 at 3).  On November 27, 2007, plaintiff underwent a proximal row carpectomy with radial styloidectomy on her right wrist.[7]  (Ex. 8 at

---

[7] This procedure requires removal of three wrist bones to relieve pain.  (Ex. 11

17-18).   After undergoing this procedure, plaintiff continued to see
Dr. O'Donovan.  (Id.).

 Opinions of Dr. Graham, Dr. O'Donovan, and Dr. Macht

 Defendant's expert, Dr. Graham, a hand surgeon and specialist,
reviewed plaintiff's medical history and records and submitted a
report dated September 10, 2008.  (Ex. 10 at 1-7).   He commented on
the "lack of historical, clinical and radiographic evidence to
support the diagnosis of [scapholunate] ligament embarrassment," and
concluded that "[t]here is no evidence that Ms. Young sustained any
injury to the right wrist at the time claimed and of the magnitude
inferred, but never substantiated, by subsequent evaluation."  (Id.
at 6.)

 Dr. O'Donovan, plaintiff's expert, on the other hand, concluded
to a "reasonable degree of medical probability" that "Ms. Young
sustained a right wrist sprain with scapholunate tear and a right
thumb ulnar collateral ligament sprain as a direct result of the
accident of September 10, 2004." (Ex. 13 at 4-5).  Dr. O'Donovan
based his opinion on plaintiff's complaints of wrist pain, "objective
findings such as swelling," her non-responsiveness to conservative
treatment, and an MRI showing her ligament tear.  (Ex. 11 at 112-13).
Dr. O'Donovan acknowledged that plaintiff had no pain in her
scapholunate region until December 2004, (Ex. 11 at 80-81), and
reconciled this fact, commenting that "a ligament injury is not like

at 107-08; Ex. 12 at 23-24).

breaking a bone.   It's not always going to swell a lot, really be sore right away.   You can have good times and bad times with the ligament." (Ex. 12 at 16, 21).   Dr. O'Donovan also recognized the importance of repairing an acute scapholunate ligament tear soon after the injury occurs (Ex. 11 at 29), and justified his conservative treatment of plaintiff, noting that surgery is

> . . . not something that has to be done right away . . .
> In fact, most of the time we'll splint the patient first
> for a while and try other modalities to try to see if they
> do okay with conservative treatment first. . . .  A
> reasonable amount of time depends on several factors.
> One, it depends on the individual . . . Depending on how
> they do you could fix the scapholunate ligament six months
> down the road."

(Ex. 11 at 17, 28).

Plaintiff also offered the testimony of Dr. Robert Macht, who examined plaintiff on March 28, 2006.   Dr. Macht testified "to a degree of medical probability" that "the 65 percent permanent/partial impairment of [plaintiff's] right wrist and hand is causally related to the September 10, 2004 accident."  (Pl.'s Ex. 3 at 44).

II.  Standard for Summary Judgment

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law [.]"  Fed. R. Civ. P. 56(c).  Thus, summary judgment is appropriate when it is clear that no genuine issue of material fact remains and an inquiry

into the facts is unnecessary to clarify application of the law. Haavistola v. Cmty. Fire Co. of Rising Sun, 6 F.3d 211, 214 (4th Cir. 1993).

The moving party bears the initial burden of showing "the absence of a genuine issue as to any material fact." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The burden then shifts to the non-moving party to "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Haavistola, 6 F.3d at 214.

To survive summary judgment, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings." Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., 475 U.S. at 586 (holding that a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Summary judgment is improper where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).

A court must view the evidence in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587. Further, the role of the Court at this stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that properly can be resolved

only by a finder of fact because they may be resolved in favor of either party." Anderson, 477 U.S. at 249-50.  Credibility determinations are also reserved exclusively for the trier of fact. See id. at 255.

However, actions brought under § 1346(b) of the FTCA "shall be tried by the court without a jury."  28 U.S.C. § 2402.  The Fourth Circuit has recognized that a court has more leeway in granting motions for summary judgment when it will sit as the trier of fact. See Int'l Bancorp, LLC v. Societe des Bens de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 362 (4th Cir. 2003).  The Court of Appeals stated:

> It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts.  If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial.

Id. (quoting In the Matter of Placid Oil Co., 932 F.2d 394, 398 (5th Cir. 1991)) (internal quotation marks and citations omitted).

III.  Discussion

The United States may be held liable for money damages in a personal injury action brought under the FTCA only if the plaintiff's injury was "caused by the negligent or wrongful act" of an employee of the federal government while acting within the scope of his

employment.[8]   28 U.S.C. § 1346(b)(1).   Under such circumstances, the United States is liable for its employee's negligence "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674.

Because the act that allegedly caused plaintiff's injury occurred in Maryland, and as the parties agree, Maryland substantive law governs this action.[9]   28 U.S.C. § 1346(b)(1); (Paper No. 40 at 16; see Paper No. 41 at 3-5).   At the same time, however, federal rules apply to the determination of sufficiency of the evidence.[10] Jones v. Meat Packers Equip. Co., 723 F.3d 370, 372 (4th Cir. 1983); see also Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982) (holding that whether there is sufficient evidence to create a jury issue on a state cause of action is controlled by federal rules); Shumaker v. United States, 714 F. Supp. 154, 158 (M.D.N.C. 1988) (recognizing that, in claims brought under the FTCA, "federal rules govern procedural questions, including . . . the quantum of proof necessary to create a jury question").   The Fourth Circuit applies

---

[8] Defendant does not dispute that Mr. Rey was acting within the scope of his employment at all relevant times.  (See Paper No. 40 at 6-7).

[9] A court must apply the "whole law" of the state where the allegedly negligent act occurred, including that state's choice of law rules, rather than merely its "internal" or substantive law (i.e. Maryland negligence law).   Richards v. United States, 369 U.S. 1, 11 (1962).  Maryland courts adhere to the *lex loci delicti* choice-of-law rule in tort cases, under which the tort law of the state where the injury was suffered governs.   Hauch v. Connor, 295 Md. 120, 123-24, 453 A.2d 1207, 1209 (1983).

[10] Actions brought under § 1346(b) of the FTCA "shall be tried by the court without a jury[.]"  28 U.S.C. § 2402.  The Court notes that the standard for determining "the sufficiency of the evidence for submission of an issue to the jury" is simply another way of phrasing the standard for creating a genuine issue of fact.   See Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 164 (4th Cir. 1988).

the federal <u>Fitzgerald</u> sufficiency of evidence standard while simultaneously relying on state court decisions for the underlying substantive law.  <u>See</u>, <u>e.g.</u>, <u>Jeffress v. Reddy</u>, 77 Fed. Appx. 627 (4th Cir. 2003); <u>Thomas v. Washington Indus. Med. Ctr., Inc.</u>, No. 98-1652, 1999 WL 507150 (4th Cir. July 19, 1999).

Under Maryland law, a plaintiff alleging negligence must prove by a preponderance of the evidence that (1) defendant had a duty to protect plaintiff from injury; (2) defendant breached that duty; (3) plaintiff suffered actual injury; and (4) the breach proximately caused that injury.  <u>Stickley v. Chisholm</u>, 136 Md. App. 305, 314, 765 A.2d 662, 668 (2001).  Because defendant contests only the causation element (<u>see</u> Paper No. 40 at 17), the Court addresses only that issue.

Importantly, negligence that qualifies as a proximate cause of an injury need not be the sole cause.  <u>Atl. Mut. Ins. Co. v. Kenney</u>, 323 Md. 116, 127, 591 A.2d 507, 512 (1991).  Rather, an injury may have more than one "proximate cause." <u>Karns v. Liquid Carbonic Corp.</u>, 275 Md. 1, 20, 338 A.2d 251, 262 (1975).  Thus, the causation element requires plaintiff to establish not that defendant's negligence was the sole cause of plaintiff's damages, but that there is a reasonable connection between defendant's negligence and plaintiff's damages. <u>Stickley</u>, 136 Md. App. at 314-15, 765 A.2d at 668.

To be reasonably connected to plaintiff's damages and thus satisfy the causation element, defendant's negligence must be both

a cause in fact of the injury and a legally cognizable cause.   Pittway
Corp. v. Collins, 409 Md. 218, 243, 973 A.2d 771, 786 (2009).   "Cause
in fact" concerns whether defendant's negligent conduct actually
produced an injury.   Id.   "Legal causation," in contrast, is "a
policy-oriented doctrine designed to be a method for limiting
liability after cause-in-fact has been established."[11]   Id.

Maryland courts employ two tests in determining whether a
negligent act is a cause in fact: the "but for" test and the
"substantial factor" test.[12]   Peterson v. Underwood, 358 Md. 9, 16,
20, 264 A.2d 851, 855, 857 (1970).   The threshold "but for" test
examines injury that would not have occurred absent defendant's
negligent conduct.   Id. at 16, 264 A.2d at 855.   However, only where
defendant's conduct was a "substantial factor" in bringing about
plaintiff's injury will such conduct qualify as an injury's cause.
Bartholomee v. Casey, 103 Md. App. 34, 56, 651 A.2d 908, 918 (1994).
See also Sindler v. Litman, 166 Md. App. 90, 113-14, 887 A.2d 97,
110 (1996) (commenting that the "substantial factor" test
supplements the "but for" test to "resolve situations in which two
independent causes concur to bring about an injury, and either

---

[11] As explained below, defendant contests both the cause in fact and legally
cognizable cause sub-elements.  The Court analyzes these issues in turn below.
[12] In analyzing causation, Maryland courts do not always articulate these tests
separately, particularly where parties contest whether plaintiff has presented
sufficient evidence to create a genuine issue of material fact.   See, e.g.,
Marcantonio v. Moen, 406 Md. 395, 415, 959 A.2d 764, 765-66 (2008) (examining
whether it was "more probable than not that the defendant's negligence caused the
alleged injury"); Walters v. Smith, 222 Md. 62, 65-66, 158 A.2d 619, 620-21 (1960)
(analyzing simply whether "the injuries sustained were the direct consequences
of [] neglect of duty").

standing alone would have wrought the identical harm"). The "substantial factor" test examines, among other things, (a) the number and effect of other factors that contributed to the harm; (b) whether defendant's conduct created a harmless situation unless and until other forces intervened; and (c) any lapse of time between defendant's negligence and plaintiff's injury. Sindler, 166 Md. App. at 114, 887 A.2d at 110 (quoting Restatement (Second) of Torts § 433 (1965)).

Under the applicable federal sufficiency standard, the Court may find adequate evidence to create a triable issue of fact with respect to causation only if expert opinion evidence establishes to a reasonable degree of medical certainty that defendant's negligence was more likely the cause of plaintiff's injuries than any other cause. Fitzgerald, 679 F.2d at 350; see also Crinkley, 844 F.2d at 165 n.2 ("[E]xpert opinion is of course the prime -- indeed usually the only -- way to prove medical causation. Once such an opinion by a qualified expert is admitted, the causation issue is for the trier of fact unless the opinion given is so manifestly incredible as a matter of physical fact within common lay knowledge that it may be legally rejected."); Owens v. Bourns, Inc., 766 F.2d 145, 150 (4th Cir. 1985) (holding that plaintiff's evidence of causation was sufficient under Fitzgerald to create a triable issue of fact in a

state law products liability action).   This standard guards against speculation or conjecture.  Crinkley, 844 F.2d at 165.[13]

Defendant's initial brief in support of its motion for summary judgment argued that defendant's negligence was not a cause in fact of plaintiff's injuries.  (See Paper No. 40 at 19). Indeed, the doctors dispute whether plaintiff suffered a scapholunate tear as a result of the accident or had a natural widening in that area. There does not, however, appear to be any dispute that she had pre-existing osteoarthritis in the affected area and there is evidence of its exacerbation.  As set forth in more detail below, the Court concludes that plaintiff has presented sufficient proof of causation in fact to create a genuine issue of material fact.

Dr. Apostolo's Opinion on Causation

As explained above, only if expert opinion evidence establishes with a reasonable degree of medical certainty that defendant's negligence was more likely the cause of plaintiff's injuries than any other cause is there sufficient evidence to create a triable issue

---

[13] Under Maryland law, "the test of the sufficiency of the evidence to take the question of causal relationship to the jury is 'reasonable probability[.]'" Wilhelm v. State Traffic Comm'n, 230 Md. 91, 103 n.1, 185 A.2d 715, 721 n.1 (1962).  This test is met "when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur)." Jacobs v. Flynn, 131 Md. App. 342, 355, 749 A.2d 174, 181 (2000)(internal citations omitted). More specifically, if an injury might have resulted from one of several causes, plaintiff must prove that defendant's negligent act is a more likely or probable cause.  Walters v. Smith, 222 Md. 62, 65, 158 A.2d 619, 620-21 (1960) (relying on an expert opinion to establish a triable issue of fact under this standard). The Maryland standard, as stated in Walters and Wilhelm, and the federal standard, as stated in Fitzgerald, is substantially similar, if not identical.   In any event, the Court concludes that the expert opinion evidence on causation is sufficient under either standard.  See Samuel v. Ford Motor Co., 112 F. Supp. 2d 460, 466-67 (D. Md. 2000) (commenting that the result is the same whether state or federal law applies).

of fact.  Fitzgerald, 679 F.2d at 350; accord Walters v. Smith, 222 Md. at 65, 158 A.2d at 620-21.

In Ranson v. Funkhouser, 258 Md. 346, 265 A.2d 863 (1970), a state case factually similar to this one, plaintiff complained of a wrist injury arising from a collision that caused his steering wheel to turn, twisting his wrist.  Id. at 347, 265 A.2d at 864.  Plaintiff suffered from pre-existing soreness in the same wrist as a result of his frequent hammer use.  Id.  A few days after the accident, plaintiff sought treatment for wrist pain, and five months later an orthopedist, Dr. Packard, diagnosed him with a wrist bone disease. Id.  At trial, Dr. Packard testified to a reasonable degree of medical certainty that the accident more likely caused the disease than did the plaintiff's hammer use.  Id. at 348, 265 A.2d at 865. However, Dr. Packard "couldn't answer with reasonable medical certainty" whether the disease would have resulted absent the accident.  Id.  The appeals court reversed the trial court's directed verdict for defendant, commenting that Dr. Packard's testimony regarding the "possibility that plaintiff's hammering could have alone caused his injury did not nullify his testimony that the accident was a more likely cause.  Id.  Indeed, the federal Fitzgerald standard would likely have compelled the same result. 679 F.2d at 350 (requiring opinion evidence on causation to establish that defendant's negligence was the more likely cause of plaintiff's injury); see also Sakaria v. Trans World Airlines, 8 F.3d 164, 172-73

(4th Cir. 1993) (requiring expert opinion evidence to establish probability, not mere possibility).

Here, Dr. Apostolo concluded that plaintiff had a 22% impairment of her right hand and wrist, 90% of which was a result of the accident (including iatrogenic features) and 10% of which resulted from pre-existing factors, and thus stated that "permanent partial impairment of the hand, wrist, and thumb attributable to this accident of September 10, 2004, is therefore 20%" (i.e., approximately 90% of 22%). Dr. Apostolo's opinion satisfies Maryland's causation tests. First, according to Dr. Apostolo, "but for" the accident, plaintiff's total impairment would be approximately 2%, rather than the current 20%. Second, Dr. Apostolo's conclusion that the accident is responsible for 90% of plaintiff's impairment supports the proposition that the accident was a "substantial factor" of plaintiff's injury.

To defendant's point, while some of Dr. Apostolo's comments imply that plaintiff's scapho-lunate interval (or tear) was a chronic condition (Paper No. 41-2), his remaining comments suggest that at least some part of her injury resulted from the accident, even if another portion resulted from Dr. O'Donovan's medical treatment. Dr. Apostolo noted that plaintiff suffered from pre-existing osteoarthritis, which was aggravated by the accident, and that medical procedures performed to correct her injury may have exacerbated it. Of course, a defendant may be liable for

exacerbation of an existing condition. <u>See</u>, <u>e.g.</u>, <u>Seites v. McGinley</u>, 84 Md. App. 292, 297, 578 A.2d 840, 842 (1990) (recognizing that a party may recover for "the aggravation of a pre-existing injury," but only for the portion of the injury that defendant aggravated). Here, the medical bills associated with repair of the alleged "tear" and the associated pain and suffering would be much more significant than any related to exacerbation of osteoarthritis.

In any event, negligence that constitutes a proximate cause of an injury need not be the sole cause, <u>Kenney</u>, 323 Md. at 127, 591 A.2d at 512, and there may be more than one proximate cause of an injury, <u>Karns</u>, 275 Md. at 20, 338 A.2d at 262. Dr. Apostolo's opinion that plaintiff's injuries may also stem in part from her preexisting conditions or from medical procedures does not foreclose plaintiff's cause of action against defendant. Moreover, nothing in Dr. Apostolo's report nullifies his "flat and unequivocal opinion" that plaintiff's impairment was 90% attributable to the accident. <u>Ranson</u>, 258 Md. at 348, 265 A.2d at 865. Certainly, if Dr. Apostolo testifies, examination may clarify his opinions. Therefore, viewing the evidence in the light most favorable to plaintiff, Dr. Apostolo's testimony does not defeat plaintiff's claim, but rather may be read to support it in some way.

<u>Dr. Macht's Opinion on Causation</u>

A medical expert need not explicitly state his opinion on causation in terms of relative probability to create a material issue

of fact for trial.  See Walters, 222 Md. at 66, 158 A.2d at 621
(accepting a medical expert's "general answer" as proof of a probable
causal relationship).  In Walters, for example, plaintiff suffered
from neurological problems prior to an automobile accident.  Id. at
63-64, 158 A.2d 619-20.  She was nearly healed by 1957, when the
accident occurred.  Id. at 64, 158 A.2d at 620.  The collision threw
plaintiff against the front seat, hurting her right shoulder, leg,
and neck.  Id.  She was diagnosed with a foot sprain.  Id.  Within
a month, she experienced headaches, dizziness, nervousness, and
difficulty thinking.  Id.  Her treating physician testified that
"the accident materially aggravated the situation which she had and
caused these symptoms."  He also acknowledged that it was reasonably
foreseeable that her preexisting symptoms would recur or worsen over
time.  Id. at 65, 158 A.2d at 620.  On appeal, the court found that
the case should have gone to trial, as the treating physician's
"unqualified opinion" that the accident materially aggravated her
condition and caused her symptoms showed at least a "reasonable
probability" that the negligence caused the harm, although he did not
use explicit terms of relative probability.  Id. at 66, 158 A.2d at
621.

Dr. Macht testified "to a degree of medical probability" that
"the 65 percent permanent/partial impairment of [plaintiff's] right
wrist is causally related to the September 10, 2004, accident."
(Paper No. 41-2).  That Dr. Macht did not attach a numerical figure

to his unqualified opinion or state explicit terms of relative probability is not dispositive.  Id.; see also Samuel, 112 F. Supp. 2d at 472 & n.16 (commenting that medical experts need not recite any "talismanic phrase" for their opinions to be admitted as causation evidence).  Thus, Dr. Macht's unqualified opinion that plaintiff suffered her right wrist injuries as a result of the accident shows at least a "reasonable probability" of causation.

Dr. O'Donovan's Opinion on Causation

At the outset, the same analysis applicable to Dr. Macht's opinion is relevant here.  Dr. O'Donovan, much like Dr. Macht, opined to a "reasonable degree of medical probability" that plaintiff's injuries were "a direct result of the accident of September 10, 2004." (Ex. 13 at 4-5).  Thus, Dr. O'Donovan's unqualified opinion similarly shows at least a "reasonable probability" of causation.  Walters, 222 Md. at 66, 158 A.2d at 621.

However, defendant argues that Dr. O'Donovan's "conclusory statements" regarding causation are insufficient to withstand summary judgment because they rest on an allegedly inadequate factual basis.  See Surkovich v. Doub, 258 Md. 263, 272, 265 A.2d 447, 451 (1970) ("[A]n expert's opinion is of no greater probative value than the soundness of his reasons give therefor will warrant."); State Health Dep't v. Walker, 238 Md. 512, 520, 209 A.2d 555, 559 (1965) (commenting that an expert opinion "derives its probative force from the facts on which it is predicated and these must be legally

sufficient to sustain the opinion of the expert"). The Court rejects this argument in light of Dr. O'Donovan's explanation that his opinion was based on plaintiff's complaints of wrist pain, "objective findings such as swelling," her non-responsiveness to conservative treatment, and on an MRI showing the ligament tear. (Ex. 11 at 112-13).

Further, defendant points out that plaintiff "had no pain in the scapholunate region" until three months after the accident. (Paper No. 47 at 4; Ex. 11 at 80-81). However, Dr. O'Donovan explained this delayed onset of pain, commenting that "a ligament injury is not like breaking a bone. It's not always going to swell a lot, really be sore right away. You can have good times and bad times with the ligament." (Id. at 16, 21).

Defendant also points to Dr. O'Donovan's delay in performing plaintiff's surgery as inconsistent with an acute scapholunate ligament injury. (Paper No. 47 at 5; Ex. 11 at 29). However, Dr. O'Donovan explained that this delay was consistent with a conservative treatment plan for such an injury (Ex. 12 at 12, 17, 28).

In light of this testimony, the Court rejects defendant's argument that Dr. O'Donovan's opinion as to causation is "wholly conclusory" and thus insufficient to overcome summary judgment.

<u>Opinion Evidence on Causation as a Whole</u>

The Court's role at this stage is not to "weigh the evidence," but to determine whether "there are any genuine factual issues that

can be resolved only by a finder of fact because they may be resolved in favor of either party." Anderson, 477 U.S. at 249.  Here, based on the conflicting opinions among qualified physicians, the Court concludes that the evidence taken as a whole is sufficient to create a genuine issue.

In Crinkley, the Court of Appeals accepted general medical opinion evidence as sufficient to create a genuine issue of fact. 844 F.2d at 164-65 (relying on medical experts' general conclusions that an assault caused victim's psychological problems and heart attack where the most specific causal opinion stated that the assault was the "prime cause").  Here, plaintiff has provided specific medical opinion evidence regarding causation,[14] bolstered by the general opinions of two other experts.[15]  The expert opinions provided by plaintiff also rise above mere speculation or conjecture. Cf. Fitzgerald, 679 F.2d at 356 (rejecting expert opinion evidence as insufficient to create a genuine issue of material fact where experts could not say with certainty that the negligence was a likely cause of the injury).

This case presents conflicting opinions among qualified physicians.  Given this conflict, a reasonable finder of fact could side with either plaintiff's or defendant's experts.  See Anderson, 477 U.S. at 249.  As a result, the Court cannot grant summary judgment

---

[14] Dr. Apostolo opined that the impairment was 90 percent attributable to the accident (including iatrogenic features).
[15] Dr. O'Donovan opined that plaintiff's injury was a "direct result" of the accident. Dr. Macht testified that it was "causally related" to the accident.

for either party.   A trial will allow the Court to question at least some of the witnesses and assess their credibility and thus more fully evaluate their conflicting opinions.

Finally, defendant argues that "to the extent the unsuccessful major reconstructive surgery (and subsequent operations that became necessary because of that reconstructive surgery), caused Ms. Young harm, defendant is not liable for such harm.   Intervening negligence is a superseding cause, and defendant should not be held liable for damages resulting from an unnecessary reconstructive surgery." (Paper No. 47 at 3).   The Court rejects this argument.

Defendant is correct that a "superseding cause" breaks the chain of causation, "in which case the original tortfeasor's liability will terminate."   Sindler, 166 Md. App. at 115, 887 A.2d at 111.   However, not all intervening forces are superseding causes under Maryland law. Id. at 115-16, 887 A.2d at 111-12.   The Sindler court summarized this relationship:

> An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence. . . .   It is a superceding cause . . . if it so entirely supercedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury. . . .   But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.

<u>Id.</u>  Defendant contends that "unsuccessful major reconstructive surgery (and subsequent operations that became necessary because of that reconstructive surgery)" are superseding causes under Maryland law.  (Paper No. 47 at 3).   The Maryland Court of Appeals, however, has held otherwise:

> It is a general rule that a negligent actor is liable not only for harm that he directly causes but also for any additional harm resulting from normal efforts of third persons in rendering aid, irrespective of whether such acts are done in a proper or a negligent manner.

<u>Morgan v. Cohen</u>, 309 Md. 304, 310-311, 523 A.2d 1003, 1005-06 (1987) (internal citations omitted).   This rule only applies if defendant's negligence was a cause in fact of plaintiff's harm, from which additional harm results.   <u>See id.</u>   Therefore, if at trial the Court determines that defendant's negligence was a cause in fact of plaintiff's injury or condition, defendant is additionally liable as a joint tortfeasor for any subsequent injury due to unsuccessful surgeries.

IV.  <u>Conclusion</u>

For the foregoing reasons, the Court concludes that plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the cause of plaintiff's injury requiring a trial. Therefore, defendant's motion for summary judgment is DENIED.

Date: 10/5/09                        /s/
                               Susan K. Gauvey
                               United States Magistrate Judge